## MOLONY a. DOWS.

*New York Common Pleas ; Trial Term, March,* 1859.

JURISDICTION OF ACTION FOR PERSONAL TORT.—LEGAL HER-
MENEUTICS.

The courts of one State or country have no jurisdiction of actions between
citizens of another State, for damages for purely personal torts, committed
within the jurisdiction of another State.

An action for an assault or false imprisonment is maintainable only in the courts
of that State where the wrong was done.

In considering the authority of a precedent in law, if a point is essential to the
decision rendered, it will be presumed that it was duly considered, and that all
that could be urged for or against it was presented to the court ; but if it ap-
pears from the report of the case that it was not taken or inquired into at all,
there is no ground for this presumption, and the authority of the case is pro-
portionately weakened.*

Motion to dismiss complaint.

This action was brought to recover damages for injuries
alleged to have been sustained by the plaintiff at the hands of
the defendant in San Francisco, California, during the time that
the government of that city was administered by what is known
as the Vigilance Committee.

The plaintiff's complaint stated in substance that defendant
was the treasurer of the San Francisco Vigilance Committee,
and, in conjunction with one William Coleman and forty others,
in May, 1856, at the city of San Francisco, of which place plain-
tiff had always been a good and peaceable citizen, formed a
body, and, in defiance of the legally constituted authorities,
broke open the jail and summarily put to death one James Casey
and one Cora, who were confined awaiting trial ; that in order to
give color to these unlawful acts, they styled themselves " The
Vigilance Committee of California ;" that in consequence of

---

* Compare New York and New Haven Railroad Company a. Schuyler, *Ante,*
239.

these and other unlawful acts, Governor Johnson, of California, issued a proclamation calling upon the citizens generally to enrol in the militia for the protection of the State ; that in accordance with such requisition the plaintiff enlisted in the militia, and while in such service was deputed to convey certain arms, which had been furnished to the State by General Wool, from Benicia to San Francisco ; that while conveying these arms, the defendant and others unlawfully conspired together and seized said plaintiff and the arms which were on board the schooner, in San Pablo Bay, going to San Francisco ; that the defendant and others then and there committed violent assaults upon plaintiff, seized his person, and kept him in a dungeon for several days, concealing his person from the United States Marshal, who wished to obtain it by means of a writ of *habeas corpus ;* that in the month of September, the plaintiff was forcibly abducted and placed on the steamboat for New York, despite his protestations to the contrary, and told never to return upon pain of death. The plaintiff claimed $100,000 as his damages.

The answer set up a general denial.

Upon the trial of the cause, after the plaintiff had closed, the defendant's counsel moved for a dismissal of the complaint.

*Charles O'Conor, James W. Gerard, and Larocques & Barlow,* for the motion.—I. The judicial power of the Supreme Court and the other courts of this State, is described in our constitution and laws as the "jurisdiction in law and equity." (*N. Y. Const.,* art. 6, §§ 3, 5, 10, 14, 21, 25 ; 2 *Rev. Stats.,* 1st ed., 196, § 1 ; 173, § 36 ; *Judiciary Act, Laws of* 1847, 323,. § 16 ; 2 *Rev. Laws of* 1813, Appendix, arts. Nos. 4 and 6.)

II. It has been uniformly held that the meaning of such general descriptive terms in our constitutions, is to be ascertained by reference to their import in the English judicial system prior to the Revolution. In this State, this must necessarily be the rule ; as all our State constitutions have declared that the common law and colonial acts, not inapplicable to our new form of government, which formed our law on the day of Lexington (April 19, 1775), should constitute the basis of our jurisprudence, subject only to alteration by the Legislature. (*N. Y. Const.,* art. 1, § 17.)

III. In favor of trade and commerce, the handmaids of civil-

ization, *debitum et contractus sunt nullius loci* was early received as a maxim. It is now an established rule of English and American law, and it ought to be universally acknowledged. (*Story's Conflict of Laws*, 3d ed., §§ 542–545; Ward *a.* Arredondo, 1 *Hopk.*, 223; *McNaghten's Select Cas.*, 22, note, 74 *Law Lib.*)

IV. Equity jurisdiction extends only to matters of contract and questions of property. It cannot be employed to procure reimbursement for the losses resulting from personal *torts.* Consequently, the maxim above cited in the third point, may be regarded as extending the power of the court to every cause of action *in equity*, wherever arising, except in cases where it is repelled by some positive impediment rendering the enforcement of any decree wholly impracticable, as in De Rivafinoli *a.* Corsetti (4 *Paige*, 270); Lewis *a.* Darling (16 *How.* (*U. S.*) *R.*, 13).

V. The jurisdiction *at law* was originally confined to causes of action arising within the realm, as the issue was to be determined by a jury of the vicinage where the fact arose, acting upon their own knowledge. (*Gould's Pleading*, ch. 3, § 103; Per Marshall, Ch. J., Livingston *a.* Jefferson, 1 *Brock.*, 206, 207; Mr. Hare's note to Mostyn *a.* Fabrigas, 2d Am. ed., of *Smith's Lead. Cas.*, vol. 1, p. 485; 43 *Law Lib.*)

VI. Jurisprudence is a practical and progressive science. It keeps pace with the changing condition of society. Accordingly, we find that as personal property increased, trade became extended, and foreign commerce was introduced, the maxim above cited in point third was by degrees brought into full operation in the English courts of common law, by a fictitious supposal allowed in pleading and not traversable. The plaintiff was permitted to suggest that the cause of action arose in England; and, so far as related to the right of trial there, the defendant was not allowed to deny the suggestion. A similar use of fictions was common in the English law. (*Gould's Pleading*, ch. 3, § 103, note 19, 2d ed.)

VII. In respect to controversies not arising on contract, the jurisdiction *at law* to give a remedy to the party sustaining an injury in another State or country, has never been invested with this universality; and, consequently, it is proper to look into the question how far the jurisdiction has been extended in this

direction, and what are its limitations. In proceeding to trace its extension, we will see further exhibited the progressive character of our jurisprudence as a practical science. 1. Any attempt to exercise extra-territorial jurisdiction in real actions, would necessarily have been futile. Consequently, no such attempt has ever been made ; but Lord Mansfield, always eager *ampliare jurisdictionem,* held that a personal action to recover a pecuniary compensation, as damages, for an injury to lands in a foreign country, was maintainable. But this decision was overruled ; and it is now firmly established in England and this country, that no such action will lie, however enormous the injury. And it makes no difference that the refusal to take cognizance may leave the injured party wholly without redress, and may actually convert the State into a city of refuge for the wrong-doer. (Doulson *a.* Mathews, 4 *T. R.*, 503 ; 1 *Metc. & Perkins' Dig.*, p. 66, § 224 ; Livingston *a.* Jefferson, 1 *Brock.*, 203 ; Watts *a.* Kinney, 6 *Hill*, 87 ; Mr. Chitty's note to 3 *Blackst. Com.*, 294.) Neither can a court of equity give a remedy. (Northern Indiana Railroad Company *a.* Michigan Central Railroad Company, 15 *How. (U. S.) R.*, 242–244.) All courts are governed by rules of law settling the boundaries of their jurisdiction. No court known to our system " administers justice in general." (Per MAULE, J., in De Bode *a.* Regina, 13 *Ad. & Ell., N. S.*, 386, note.) 2. The protection of trade and commerce has induced the courts of common law to remedy by action injuries to *personal property* committed on the high seas and in foreign parts ; and it may be considered that *in general,* such an action will be allowed in the courts of law, even where both parties are strangers. For this purpose, the fictitious supposal has been allowed in these cases. (Glen *a.* Hodges, 9 *Johns.*, 69 ; M'Kenna *a.* Fisk, 1 *How. (U. S.) R.*, 248, 249 ; Mitchell *a.* Harmony, 13 *Ib.*, 137 ; Percival *a.* Hickey, 18 *Johns. R.*, 258 ; Ruan *a.* Perry, 3 *Cai.*, 121 ; Mason *et al. a.* The Blaireau, 2 *Cranch*, 264 ; Hale, &c., *a.* Lawrence, and other cases, 1 *Zabr.*, 248–266 ; *Ib.*, 714–751 ; 2 *Ib.*, 72–117 ; see 107 ; 3 *Ib.*, 9–28 ; 590–616. See also Hon. H. E. Davies' separate report of American Print Works *a.* Lawrence.) 3. As it respects *personal torts* committed without the country, the fictitious supposal before alluded to, and by which jurisdiction is gained, as it were, by stealth, has not been introduced, or, at least, has found reception

only in certain classes of very special cases. The present action cannot be ranged under any of these classes. (*a*) Torts upon the high seas are remediable in the admiralty. And, though it is a disputable point, we might concede that, in proper cases, the common-law courts may assume concurrent cognizance of them. (Wilson *a.* Mackenzie, 7 *Hill*, 97 ; *Benedict's Adm.*, §§ 46, 126, 308.) The jurisdiction in these cases is yet an unsettled question between the admiralty and the common-law courts. It is unnecessary to touch that question in this case. But, as we shall presently show, not only the court of admiralty, but the common-law court, exercises a discretion whether or not it will take cognizance of personal torts in actions between strangers. (*b*) Torts committed upon the person or personal rights of one of our own citizens in a foreign State or country, should be remedied by all means in our power. Like the natural right of self-defence in individuals, the right of protecting its own members from outrage is an inherent right of every organized community. It is not only a right, but a duty. Consequently, we will admit that, under its qualified power of adapting itself to the due administration of justice, the common-law court may extend its fictitious supposal to *this* case. (See Mr. Butler's learned note to *Coke on Litt.*, 291 *a*, last page of the notes, vol. 3.) Whether this principle should apply as between the States of this Union, so as to warrant a New York court in taking cognizance of an action for an assault committed on a citizen of New York in California, by a citizen of California, is a very delicate question. It may be greatly doubted whether it could be allowed. The United States courts in California afford a full remedy. (*c*) One other class of cases deserves notice. Should a State allow to a stranger the privilege of prosecuting in its courts for a personal tort committed in some foreign place, not within the territory of any regular government? We do not admit, but for the purposes of this case will assume, that it may be a part of the duty which every civilized State owes to the general society of mankind, to allow a judicial remedy in such cases against an aggressor found within its territories, when no redress can be had elsewhere, and when exercising the jurisdiction would not involve greater public inconvenience. Such a policy might, under certain circumstances, allow of the vindication of a stranger's wrongs by civil

action here, in the case supposed, *against one of our own citizens found here*. (Rafael a. Verelst, *W. Blacks.*, 983–1056, 1067.) But it would never warrant an action here for a personal tort committed in the wilds of Africa, on a foreigner, by a subject or citizen of a civilized State permanently dwelling therein, and easily suable in its courts, though such wrongdoer should happen to be served with process when temporarily here. We insist, therefore, that according to established principles, our common-law courts cannot entertain a suit to redress a personal tort suffered by a citizen or subject of another State or country within its territory, at the hand of a fellow-citizen or subject. And if such a jurisdiction does exist, its exercise cannot be claimed *ex debito justitiæ*, but rests in sound discretion. (Johnson a. Dalton, 1 *Cow.*, 548; Taylor a. Carryl, 20 *How.* (*U. S.*) *R.*, 611; Gardner a. Thomas, 14 *Johns.*, 136.) Lord Mansfield's opinion in the great case of Fabrigas and Mostyn, which has been read with great interest by every lawyer, might give rise to some misapprehension on this subject in the mind of a casual reader. But it does not militate in the least against our position; we say that English courts of common law have never entertained an action for a personal tort committed in a foreign civilized State on a citizen or subject thereof. Mostyn a. Fabrigas (1 *Smith's Lead. Cas.*, 355, 356; 20 *State Tr.*, 82) was a suit in England, by an English subject against an English governor, for personal injuries committed in an English province. It may have been right; it was a strong-handed decision of Lord Mansfield, made in 1774. In point of jurisdiction it was mainly founded upon a peculiar control over provincial functionaries, claimed by the court. It throws no light upon this question. There are many other cases like Mostyn a. Fabrigas. The home courts seem to have justly exercised a supervisory jurisdiction over English officials, acting oppressively in English colonies. It seems to have been necessary to hold them amenable to civil justice in English courts. (Per Powell, J., 6 *Mod.*, 195; Lord Bellamont's Case, 2 *Salk.*, 625; Comyn a. Sabine, *Cowp.*, 169; Shelling a. Farmer, *Strange*, 646.) There can be little doubt that those cases went upon the idea that no justice could be had in the colonies. They were generally against the *viceroy*. These viceroys claimed immunity from coercion by legal process. And, in a great degree, they had that immunity. (Hill a. Ran-

dall, 3 *Moore's P. C. Cas.*, 465.) We have assigned another
position to the anomalous case of Rafael *a.* Verelst; but it is
doubtful whether it does not come under this head. Verelst
was governor of an English factory in the East Indies, and his
wrongful acts were committed by him officially as governor.
Rafael *a.* Verelst (2 *W. Blacks.*, 983, 1055, 1067) was trespass
by an American against Verelst, president of Calcutta, and
chief local civil officer of the East India Company, for an arrest
and false imprisonment, committed within the territory of an
independent sovereign prince of India. The action was sus-
tained. The point of jurisdiction was faintly made by counsel,
if at all; and it was but briefly noticed by the court (p. 1058).
A writ of error was brought; but what became of it does not
appear in the reports (2 *W. Blacks.*, 1067; *Cowp.*, 425). This is
the only English decision which can fairly be said to affirm the
jurisdiction. It was made in the year 1776; and, therefore, it
is not authority in this State. This is believed to be the only
case in which the English courts have ever sustained a stranger's
action for a mere personal tort committed upon him in his own
country. Rafael *a.* Verelst is also subject to an observation
rendering it quite inapplicable to the general question now be-
fore the court. The tort was committed by a public servant of
Great Britain, though not directly commissioned by the crown;
and there was no legal tribunal, in the country where the tort was
committed, having power or jurisdiction to redress it. Perhaps
the government of Great Britain was bound by public law to give
a remedy against its own official for any act of cruel oppression
repugnant to natural right, and otherwise irremediable. This
view of the case would place it on essentially the same ground
as Fabrigas *a.* Mostyn. The courts of England also exercised
criminal jurisdiction over government officials for acts of op-
pression in the colonies; and there seems no ground of policy
to make a distinction against their civil jurisdiction. (Sir
Thomas Picton's Case, 30 *How. State Tr.*, 226–957; Macken-
zie's Case, 5 *Celebr. Tr.*, 115; London ed., 825.) The notion
that mere personal torts are universally transitory, finds no
countenance in the law. The only opinion of Lord Mansfield
bearing upon the point, is adverse to it. In the same great case
of Mostyn *a.* Fabrigas, decided in 1774, he says: "There may
be some cases arising abroad which may not be fit to be tried

Molony a. Dows.

here; but that cannot be the case of a governor injuring a man contrary to the duty of his office, and in violation of the trust reposed in him by the king's commission." (1 *Smith's Lead. Cas.*, 355.) And he then expresses his doubt as to the right to import all private personal trespasses, committed on foreigners abroad, in their own country. He says: "If two persons fight in France, and both happening casually to be here, one should bring an action of assault against the other, it might be doubtful whether such an action could be maintained here." "It might perhaps be triable only where both parties at the time were subjects." Our venue statutes as late as 1830, seem to negative the idea that we have jurisdiction of foreign assaults and batteries, &c.

VIII. If this court has no jurisdiction of the case, or is bound in the exercise of a sound judicial discretion to decline it, the plaintiff's complaint should be dismissed. (*Code*, § 148, Voorhies' 5th ed., p. 161, and note on p. 162; 14 *Johns.*, 137, 138; Dicas *a.* Brougham, 6 *Car. & P.*, 392, 393.)

IX. This is precisely one of those cases in which the courts of this State ought to decline jurisdiction. 1. The case alleged is, that the defendant, conjointly with others, formed a treasonable insurrection against the authorities and government of the State of California; and, as a part of their hostilities, assaulted and imprisoned the plaintiff, and ultimately expelled him from the country. (*Ex parte* Bollman, 4 *Cranch*, 126, 127, 133, 135; 4 *Wendell's Blackst.*, 82, §§ 3, 4.) 2. It is the settled policy of these States to abstain from all interference with such disturbances, arising within the borders of a foreign country. We would not deliver up to their justice defeated rebels seeking refuge in our territory, though stained with a thousand crimes; neither have we ever tolerated a private civil action against such persons for redress of the injuries they may have inflicted upon the persons or property of their countrymen during the contest. This policy will never be departed from, although it is obvious that under it a manifest failure of justice might often occur. (*Bowyer's Pub. Law*, 235.) 3. Such disturbances may occur in the States of this Union. It is said the reign of the first and second Vigilance Committees at San Francisco, in 1851 and 1856, were of this character. Shay's rebellion in Massachusetts, and Dorr's in Rhode Island, are also instances. (Luther

*a.* Borden, 7 *How.* (*U. S.*) *R.*, 1, pp. 45, 50, 54, 55, 58, 62, 68, 69, 71, 79, 81.) 4. Even in States of this Union such movements are unlawful rebellions or praiseworthy revolutions, according to the event. The judgment of the prevailing party, pronounced by *its* judicial tribunals, determines finally and conclusively the lawfulness or unlawfulness of all violence exerted against the persons or property of the citizen; and with that judgment no tribunal of a sister State ought to interfere. (7 *How.* (*U. S.*) *R.*, 54, 55.) 5. The propriety of abstaining from the exercise of jurisdiction in such cases is manifest. It is a policy far more imperative in the case of a sister State than in reference to foreign States. We do not owe to the citizens of a · sister State any aid against or protection from the injustice; real or supposed, of their own laws, or against inefficiency or partiality in the administration thereof. (*Bowyer's Pub. Laws*, 173; Commonwealth *a.* Aves, 22 *Pick.*, 220; Jack *a.* Martin, 14 *Wend.*, 520.) It would be an infraction of our federal compact to attempt such a thing. Courts of equity, in mere questions of property, to prevent rapine and a total failure of justice, will extend its remedial processes to cases properly belonging to foreign tribunals. (7 *Paige*, 241; 1 *Barb. Ch. R.*, 217; 6 *Hill*, 88.) But the jurisdiction at law cannot be extended by the judges on such grounds. If it could, that ground would never exist in a case like the present. California may demand, and we are bound to deliver to her for punishment, all fugitives from her justice. (*Const. U. S.*, Art. 4, § 2.) Inter-state comity is the principle which binds us to allow the citizens of a sister State to resort to our courts of justice for redress of injuries. It would be a violation of that comity, and an offence against the wishes and policy of a sister State, to allow her citizens to prosecute actions here against their fellow-citizens for acts committed within her borders, for which she denies a remedy. (Hoyt *a.* Thompson, 1 *Seld.*, 340.) By the common law, which obtains in California, the civil injury to individuals resulting from the commission of a treason or other felony against the State, is merged in the crime until the public offence is duly prosecuted. This rule of State policy would be broken down by allowing the injured party a civil remedy in our courts. (4 *Wendell's Blackst.*, p. 6, note 5; *Ib.*, p. 363, note 33; Rogers *a.* Huie, 1 *Cal. R.*, 434, 435.)

*Francis B. Cutting* and *George Bowman*, opposed.—I. The Court of Common Pleas, in and for the city and county of New York, possesses (subject to the exceptions and limitations prescribed by statute) jurisdiction of all actions, local and transitory, where the defendant resides, or is personally served with process, within the city and county. And its jurisdiction is as complete as that of the Supreme Court, which in the exercise of its jurisdiction combines the powers of the King's Bench, the Common Pleas (of England), and the Exchequer.

II. The principle recognized and adopted by the law of England and of this State, is to afford redress in their tribunals in all cases of personal actions, whether arising *ex contractu* or *ex delicto.* 1. The maxim *debitum et contractus sunt nullius loci* well expresses this familiar proposition : that the courts here and in England take cognizance of all debts, and causes of action arising on contracts entered into, or to be performed abroad. (7 *Coke*, 3 *a ;* 2 *Instit.*, 229, 331 ; *Story's Conf. Laws*, §§ 542–545.) To adjudicate in these actions, nevertheless, involves the necessity of examining and deciding upon the laws of the place where the contracts were made. 2. These courts take jurisdiction of all controversies concerning contracts relating to lands, although such lands are situated in foreign countries, and will decree specific performance, &c. It is true, they will not entertain actions concerning lands which proceed *in rem*, or which concern the title or possession, because this would be an interference with the claims of sovereignty of the country in which the lands are situated. 3. These courts have always taken cognizance of actions of tort for injuries to persons or to personal property, even in favor of mere strangers. (Corbett *a.* Barnes, *Cro. Car.*, 444; Mostyn *a.* Fabrigas, 1 *Cowp.*, 180 ; Rafael *a.* Verelst, 2 *W. Blacks.*, 1055 ; Comyn *a.* Sabine, *Cowp.*, 169 ; Shelling *a.* Farmer, *Stra.*, 646 ; Lord Bellamont's Case, 1 *Salk.*, 625 ; 1 *Smith's Lead. Cas.*, 681; Dinsmore *a.* Wilkes, 12 *How.*, 390; S. C. 7 *Ib.*, 89; Mitchell *a.* Harmony, 13 *How.*, 115 ; McKenna *a.* Fisk, 1 *How.* (*U. S.*) *R.*, 241 ; Shaver *a.* White, 6 *Mumf.*, 110 ; Watts *a.* Thomas, 2 *Bibb.*, 458 ; Hutsonpillar *a.* Hover, 12 *Gratt.*, 579.) But the power to take jurisdiction over torts committed beyond the territory of the State, by citizens of other States upon each other, is not an open question in New York. (Smith *a.* Bull, 17 *Wend.*, 323 ; Ruan *a.* Perry, 3

*Cai.*, 121 ; Percival *a.* Hickey, 18 *Johns.*, 258 ; Johnson *a.* Dalton, 1 *Cow.*, 543 ; Wilson *a.* McKenzie, 7 *Hill*, 97 ; Glen *a.* Hodges, 9 *Johns.*, 57.)

III. The action clearly lies in the present instance, because one of the wrongs complained of was the forcible expulsion of the plaintiff from the State of California, from returning to which he was prohibited by the defendant and his confederates under pain of death; and being prevented, therefore, from personally appearing in the courts of California, those of New York ought not to be closed against him, when the wrongdoer is personally found within their jurisdiction.

IV. This action is not merged in or suspended by any crime, which the evidence has established against the defendant. 1. The testimony shows that he was guilty of a misdemeanor merely, and not of a felony. 2. This action does not seek to recover back property feloniously taken or obtained; but claims redress for the trespass upon the person. The rule of merger never applied to such an action. The common-law rule of merger is not applicable to, and has not been recognized by the current of authorities in this country. (Boston and Worcester Railroad Company *a.* Dana, 1 *Gray*, 83 ; 4 *Ohio*, 377 ; 6 *B. Mon.*, 38 ; 3 *Hawks*, 251 ; 6 *Rand.*, 223 ; 3 *Bland*, 114 ; 1 *Miles*, 312 ; 6 *N. Hamp.*, 454 ; 2 *Root*, 90 ; 1 *Const. R.*, 231 ; 3 *Iowa R.*, 327 ; 17 *Ill. R.*, 413 ; 6 *Tex. R.*, 6 ; see also 37 *Eng. Law & Eq. R.*, 406.)

DALY, J.—The short period that has elapsed between the close of the argument and the time for the decision of this motion, has barely sufficed to enable me to do more than examine the large number of authorities cited in the course of it; and in deciding the motion, I am enabled only to express my views in a very general way. I think the point is well taken that an action cannot be maintained in this court, or in any court of this State, to recover a pecuniary satisfaction in damages for a wilful injury to the person, inflicted in another State, where, at the time of the act, both the wrongdoer and the party injured were domiciled in that State as resident citizens. It is a general principle of the law, that every right withheld should have its remedy, and every wrong done its proper redress; but in applying this broad principle, the distinction must not be lost sight

of, between those actions which are brought for the purpose of obtaining that to which the plaintiff has a right, and those which partake of the double character of a private injury and a public wrong.

To the latter class belong actions for violence done to the person, and this is an action of that kind. It is for forcibly seizing the person of the plaintiff, restraining him of his liberty, and causing him to be transported by force out of and beyond the limits of California,—an act intentionally and wilfully done, and therefore falling within that class of cases, in which, from the tendency of such an act to disturb the public peace, there is both a crime or misdemeanor, as well as a private injury. By the law of this State—and I must presume, until the contrary is shown, that the laws of California are the same—such an act, if it had occurred here would subject the offender to fine and imprisonment, as well as to a civil action for damages at the suit of the injured party, in which action the jury would be entitled to take into consideration the effect or tendency of such an act to disturb the public peace ; and in view of its public tendency or effect they would have the right to go beyond what might suffice as a compensation or reparation to the injured party, and enhance the damages by way of punishment to the offender. This right on the part of a jury in such an action to give punitory or vindictive damages has been recognized by the Court of Appeals in the late case of Thompson *a.* Keareber (7 *Am. Law Reg.*, 50), and must now be regarded as the law in this State. And this element—the consideration of the offence offered to the peace and good order of the State, as a ground for imposing enhanced or additional damages by way of punishment—shows that there is embraced in every such action, not only reparation to the injured individual, but also, in addition, pecuniary satisfaction, enforced for the general welfare and benefit of the community or State.

By the comity of nations, the courts of all civilized countries lend their aid, as a general rule, to enable a party to obtain that to which he has a right, where, from the nature of the subject-matter and the position of the parties, it is in their power to do so ; but it does not follow from this that they will undertake to redress every wrong that may have happened in any part of the world, because the parties, plaintiff or defend-

ant, may afterwards happen to be within their jurisdiction. The extent to which they will go, upon the principle of comity I have stated, is, I think, neither doubtful nor uncertain, but very clearly defined.

In view of the intercommunication between the people of all countries that springs out of commerce, and the multiplied relations and infinite interests to which it gives rise, courts of justice have recognized and acted upon the maxim, *debitum et contractus sunt nullius loci;* for debts or contracts cannot be regarded as having any fixed place or locality, and the nature of such obligations and the duty of enforcing them, where the ability exists, is and ought to be recognized by every tribunal.

Hence, contracts wherever made, or whoever may be the parties that entered into them, have always been enforced when jurisdiction of the parties is obtained, by the courts of this country or of England; and several cases in this country authorize the further conclusion, that actions to recover compensation for injury done to personal property comes within the reason of the rule upon which this comity is founded. But the invasion of the personal liberty of an individual, either by an assault upon his person, the restraint of his liberty, or any other unlawful employment of force to the detriment or injury of his person, stands upon a very different footing; and where redress may be had at the tribunal of the State or country where his person was assaulted or his liberty was invaded, I know nothing in the principles or the policy of the law authorizing other tribunals to interfere for the redress of such an injury, but very weighty reasons against it. Without suggesting other considerations, this case itself affords a sufficient illustration.

The injury here complained of was the deliberate act of an extensive body organized in the city of San Francisco under the name of a Vigilance Committee, assuming for the time being in that city the functions of government, acting in concert, maintaining an armed force, seizing persons accused of crimes and publicly putting them to death. And the question involved in such a movement or social irruption, so public in its object and so deliberate in its action, namely, whether it was an unwarrantable exercise of power or a political necessity, is more appro-

priately examined, and can be better ascertained within the limits of the State where it occurred, than before the tribunals of other States or of other countries. The duty of any government or State to protect the person of the citizen against unlawful violence, and to enforce his right to reparation from the wrong-doer who lays violent hands upon him, is founded upon the principle laid down by Lord Coke in Calvin's case, that allegiance and protection are reciprocal; and hence, as between British subjects, wherever throughout the British dominions the reciprocal obligation of allegiance and protection extends, the courts of Westminster Hall have entertained jurisdiction of actions for injuries to the person. Within this class are the many cases cited upon the argument, in which the governors of distant colonies, or official persons, have been held to answer for personal torts.

The case of Rafael *a.* Verelst (2 *W. Blacks.*, 1055) forms no exception; for, although the unlawful seizure of the plaintiff's person in that case was in the province of Oude, in the dominions of Sujah Dowlah, an independent prince, the plaintiff's imprisonment was continued in the province of Bengal, of which the defendant was president. The British courts, moreover, in recognition of the duty of British subjects to obey the laws, will hold them amenable for injuries done within the British dominions to strangers or foreigners. This was the case of Rafael in the case just referred to, who was an Armenian merchant; but it is more strongly illustrated by the case of Tivelat *a.* Morrison (*Yelv.*, 198), in which a merchant of Brabant, trading in England, maintained an action against a British subject for calling him a bankrupt in England; and in Pisani *a.* Lawson (9 *Bing. N. C.*, 90), in which a foreigner, residing and living at the time in Constantinople, maintained an action in the Common Pleas for a libel published concerning him in England.

Resident strangers or foreigners, as they owe obedience to the laws, are entitled to the protection of the laws; hence, in English courts, actions between foreigners for injuries to person or property occurring within the British dominions may be maintained; but this is the limit, and I think no case will be found in the whole course of English jurisprudence in which an action for an injury to the person, inflicted by one foreigner

upon another in a foreign country, was ever held to be maintainable in an English court.

The only thing bearing upon the subject is the remark of Lord Mansfield in Mostyn a. Fabrigas (1 *Cowp.*, 161), in which he questions the existence of the right. The absence of all authority in England upon such a point is almost as conclusive as an express adjudication denying the existence of such a right.

In this country, and especially in this State, actions for injuries to the person occurring upon the high seas, even as between foreigners, have been allowed; but in the leading case, Gardener a. Thomas (14 *Johns.*, 134), the distinction is taken by the court that the injury occurred without the actual or exclusive territory of any nation; and it may be said, in consonance with the principles here recognized, that a similar rule would apply where the injury is done in a country or place where there is no government or tribunal to afford redress. In our country, the principle of the reciprocal duties of obedience and protection equally applies. The citizen owes obedience to the general government, and the general government affords him protection as far as its constitutional power or limit extends. Beyond that, this reciprocal relation subsists between him and the government of the particular State of which, for the time being, he is a member, which in that respect has all the powers and attributes of a sovereign State; and it is to that State that he trusts chiefly for the security of his person, through the operation of the laws it has enacted for his protection and benefit. If an assault is made upon his person, he has such remedy as the laws of the State provide, to which, for the time being, he belonged, and where the wrong was done him; and as the act is not only an injury to him, but also a disturbance of the peace and good order of the people of that State, and as both considerations enter into and affect the civil action for damages, I think the action maintainable only in the State where the unlawful act was done.

Two cases cited upon the argument are not reconcilable with the conclusion here arrived at. It was held in Walls a. Thomas (2 *Bibb.*, 458), in 1802, that though the injury was inflicted in the territory of Indiana, an action was maintainable in the court of Kentucky; but the decision was put upon the ground

that the point was decided in Mostyn a. Fabrigas (1 *Cowp.*)—a clear misapprehension on the part of the court, as no such point arose in that case, or was passed upon.

In Smith a. Bull (17 *Wend.*, 322), the action was for assault and battery, committed in Pennsylvania; but the right to maintain such an action in this State was conceded by the counsel for the plaintiff in error, and taken for granted by Mr. Justice Cowen, by whom the opinion of the court was delivered. The question considered and passed upon by the court was, whether the statute, which declared that actions for injury to the person should be tried in the county where the cause of action arose, applied to the Court of Common Pleas, where this action was brought, or was limited to the Supreme Court. If this case is to be considered as a precedent, and binding as an authority upon the point not taken nor inquired into, though involved, then it would be controlling upon the motion. But I do not think that it is. If a point is essential to the decision rendered, it will be presumed that it was duly considered, and that all that could be urged for or against it was presented to the court; but if it appears from the report of the case that it was not taken or inquired into at all, there is no ground for this presumption, and the authority of the case is proportionately weakened.

The learned Dr. Lieber, in his work on *Legal Hermeneutics*, defines a precedent in law to be a decision arrived at by a competent tribunal after a patient inquiry into all points bearing upon the subject decided; and certainly this case does not come up to such a definition : and he further remarks—" If we are convinced, after patient inquiry, which includes a thorough knowledge of the subject-matter, that we ought in justice to deviate from the former decision, we do wrong to perpetuate it ;" that " the most eminent jurists, such as Lord Mansfield, have acted upon this principle, and overruled what was wrong, though with great caution."

After two days spent in the argument of this question, by most able counsel, involving the examination of every authority bearing upon the question that diligence or acuteness could suggest, and giving to it such further research as the limited time afforded me would permit, I feel that I come within this learned civilian's requisition, and may assume the responsibility of refusing to adhere to, or be governed by, the authority of a case

where the point I am now required to pass upon was taken for granted without any examination, either upon principle or authority. Having come to this conclusion, it becomes unnecessary to examine the other point discussed upon the motion.

A nonsuit must be entered.

---

## FORD *a.* SAMPSON.

*Supreme Court, Second District; General Term, May,* 1859.

### ACTION FOR LANDS.—PLEADING.

In an action to recover possession of real property, an answer denying that defendant is in possession, or that he unlawfully withholds possession, does not raise the question of adverse possession, or authorize a recovery on that ground.

If the defendant seeks to prevail on the ground of an adverse possession, or to defeat the plaintiff's title on the ground that the conveyance under which he claims was made pending an adverse possession, he should in his answer set up title in himself, or out of the plaintiff.

Motion to turn a verdict for defendant into a verdict for plaintiff.

This action was brought by the plaintiff, who owned and occupied a lot of ground in Brooklyn, to recover from the defendant, who owned and occupied the adjoining lot, a gore or strip which the plaintiff claimed to belong to him, but which, by reason of the division fence being deflected from the true boundary, as plaintiff alleged, was in possession of the defendant.

The complaint alleged seizin and right of possession in the plaintiff to the lot described, including the gore in question, and that the defendant, at the time of the commencement of the action, was in possession of a portion of the lot which he unlawfully withheld from plaintiff, although possession had been by him demanded.

The defendant, in his answer, denied that he was in possession of a portion of the premises as bounded and described in the complaint; and denied also any demand of possession, or un-