THE CHASE NATIONAL BANK OF THE CITY OF NEW YORK, Plaintiff, *v.* CHICAGO TITLE AND TRUST COMPANY, as Executor of the Last Will and Testament of EDITH ROCKEFELLER MCCORMICK, Deceased, and Others, Defendants.

Supreme Court, New York County, March 15, 1935.

*Milbank, Tweed, Hope & Webb* [*Harrison Tweed, William Dean Embree* and *Wilber Stammler* of counsel], for the plaintiff.

*Martin Taylor,* for the defendant Chicago Title and Trust Company.

*John E. Mack,* for the defendant Fowler McCormick.

*Thomas G. Chamberlain* [*John W. Davis, Otis Bradley, David E. Hudson* and *Edward J. Willi* of counsel], for the defendant Muriel McCormick Hubbard.

*Thomas M. Debevoise* [*Eugene Congleton* of counsel], for the defendants John D. Rockefeller, Jr., and others, as a committee.

*Curtis, Fosdick & Belknap* [*Chauncey Belknap* of counsel], for the defendants The Rockefeller Foundation and others.

*Raymond E. Fosdick,* guardian *ad litem.*

*Ernst, Gale, Bernays & Falk* [*Edwin A. Falk, Henry Gale* and *Samuel E. Hirsch* of counsel], for the defendants Rissman and Baldwin.

ROBERT McC. MARSH, Referee. This is an action by the trustee under a deed of trust for the settlement of its accounts and for directions with respect to the further holding of the trust fund, the life beneficiary having died. It involves questions concerning the existence and exercise of a testamentary power of appointment, and others relating to the allocation of a stock dividend.

The trust deed was executed in New York by John D. Rockefeller, a citizen and resident of New York, to the Equitable Trust Company, a New York corporation having its place of business within the State of New York, on July 3, 1917, and by its terms transferred and conveyed to the latter, as trustee, 12,000 shares of the capital stock of Standard Oil Company of Indiana, the income from which (less a certain annuity later canceled) was to be paid to the grantor's daughter, Mrs. Edith Rockefeller McCormick, for life. It was further provided that the principal of the trust fund should, upon Mrs. McCormick's death, be paid over either to such of her issue or to such charitable corporations as she might select, in such manner and proportions, and with full power of exclusion, as she should

appoint by last will and testament; and in default of the exercise of such power of appointment a division was directed into a series of equal trust funds for the benefit of her children and their issue, *per stirpes*.

About six months after the execution of this trust deed and on January 19, 1918, another document was executed by the trustee, Mr. Rockefeller and Mrs. McCormick, wherein was recited the desire of the parties that Mrs. McCormick's testamentary power of appointment contained in the trust deed should be surrendered and annulled, and whereby Mrs. McCormick in form surrendered and released all such power of appointment and covenanted not to exercise or attempt to exercise the same. The document expressed an acceptance by Mr. Rockefeller and the trustee of such surrender and release, and also the consent and declaration of the respective parties that the trust deed be and thereby was amended by eliminating therefrom any and all grant of any power of appointment to Mrs. McCormick, and all reference thereto. Mrs. McCormick's three children, the defendants Fowler McCormick, Muriel McCormick Hubbard and Mathilde McCormick Oser, were then infants and did not join in this instrument.

Mrs. McCormick died in 1932, a resident of Chicago, Ill., leaving a will dated August fourth of that year, which was thereafter duly admitted to probate by the Probate Court of Cook county, Ill., and under which letters testamentary were issued to the defendant Chicago Title and Trust Company as executor. This will contains no specific reference to the deed of trust of 1917, or the power of appointment, but by its terms one-third of the entire estate of the testatrix was bequeathed and devised to her daughter Mrs. Hubbard, one-sixth to her daughter Mrs. Oser, one-twelfth to her son, Fowler McCormick, and the residue to one Edwin D. Krenn, who was not related to her by blood.

The Equitable Trust Company of New York, the trustee, was consolidated on May 31, 1930, with the Chase National Bank of the City of New York, the plaintiff herein, which thereupon succeeded to all its rights, duties and powers. The account of the prior trustee from the creation of the trust to December 7, 1926, was settled in a former action by a judgment of the Supreme Court dated January 3, 1927, at which time the principal of the trust fund consisted of 237,070 shares of stock of the Standard Oil Company of Indiana. In its present account the plaintiff charges itself as of March 13, 1933, with 355,671 shares of such stock, all of which have been treated as principal, including 118,557 shares received as a stock dividend early in 1929. At the time of the creation of the trust the market value of the trust fund was about $9,000,000

and the annual income $288,000; at the present time the shares held have a market value of about $9,500,000 and yield an annual income of over $350,000.

The answers of the defendants present two separate and distinct controversies. The first arises from the claim of Muriel McCormick Hubbard, daughter and legatee of the life beneficiary, that the outright ownership of not less than one-third of the trust fund has passed to her by virtue of her mother's will, despite the fact that it is not mentioned therein and despite the attempted termination of her mother's power of appointment by the instrument of January 19, 1918. In this claim Mrs. Hubbard is not supported by her brother and sister, whose shares under the will would be less than the principal of the respective funds for their benefit in the hands of the trustee, or by her colegatee Krenn or his assignees, who in no event could take anything under the limited terms of the power.

Mrs. Hubbard's counsel contend vigorously that there was no legal way in which the power of appointment could be terminated or destroyed, at least without the consent of all the persons in whose favor it might have been exercised. The testamentary power, being limited in the benefit of its exercise to Mrs. McCormick's issue and to charitable corporations, falls within the class described in the New York statutes as a special power in trust. (Real Prop. Law, §§ 135, 138.) The latter section reads as follows: " A special power is in trust, where either, (1) The disposition or charge which it authorizes is limited to be made to a person or class of persons, other than the grantee of the power; or, (2) A person or class of persons, other than the grantee, is designated as entitled to any benefit, from the disposition or charge authorized by the power." These statutes apply to both real and personal property. (*Cutting* v. *Cutting*, 86 N. Y. 522; *Hutton* v. *Benkard*, 92 id. 295.) The exercise of Mrs. McCormick's power was not imperative, however, but purely discretionary, as she was entitled by its terms to appoint or not to appoint, as she saw fit. (Real Prop. Law, § 157.)

In the 175 printed pages of briefs devoted on both sides to this point alone, only one case is cited in which the question of termination of such a power through surrender or release by the grantee with the grantor's consent has been considered, and it was there left unanswered. (*Newton* v. *Hunt*, 59 Misc. 633; affd., *sub nom. Newton* v. *Jay*, 107 App. Div. 457; modfd. and affd., on separate appeal, 134 id. 325.) In that case where there was a remainder interest vested equally in the grantee's children subject to the reserved power of the grantee, who was also the grantor, to vary the disposition and distribution among the children unequally,

BISCHOFF, J., at Special Term held that this power of unequal distribution was a special power in trust which could not be completely released by the grantee to her children while one of them was a minor, and that a mortgage by the adult children on their respective interests was subject to a divesting of such interests through subsequent appointment in favor of the minor child (59 Misc. at p. 640). The Appellate Division held the consideration of these questions to have been premature, and modified the judgment accordingly, stating in the opinion that the four justices taking part in the decision were equally divided with respect to the survival of the power (134 App. Div. at pp. 331, 337). Two other justices not participating in that decision had on a prior appeal concurred in a dictum implying that the power had been effectively released (134 App. Div. at p. 331; 107 id. at p. 468).

In *Towler* v. *Towler* (142 N. Y. 371) there is a dictum that a special testamentary power of appointment held by the owner of a legal life estate might be extinguished by conveyance of the life estate to the remaindermen. This dictum, however, was not concurred in by a majority of the court and is scarcely supported by the reference to Kent's Commentaries, though perhaps sound at common law.

The classification of powers established by the Revised Statutes, comprising beneficial powers and powers in trust, each of which might be either general or special, was considered by the revisers one of their chief contributions to a simplification of the law. (Real Prop. Law, § 133; notes of the original revisers, cited in Fowler Real Prop. Law [3d ed.], p. 1299.) The terminology was in some respects novel. Apart from these statutes the terms " powers in trust " and " imperative powers " have been considered substantially equivalent. (2 Sugden Powers [3d Am. ed.], p. 151; Gray, Powers in Trust, 25 Harv. L. Rev. 1; Simes, Powers in Trust, 37 Yale L. J. 65, 66.) The essence of the trust consisted in the imperative duty to exercise the power (*Brown* v. *Higgs*, 8 Ves. Jr. 561), and no case has been cited in which a wholly discretionary power of appointment, the exercise or non-exercise of which rested in the choice of the donee, was referred to as a trust at common law. What then did the revisers mean when they ascribed the quality of being " in trust " to a purely discretionary special power of testamentary appointment? What legal consequences were intended to follow?

Answers to these questions are not easily found elsewhere in the statute. It was early prophesied that the brief and pithy style adopted for the recasting of so abstract a branch of the law was likely to develop obscurity, omissions and uncertainty, requiring

judicial interpretation and even judicial legislation. (4 Kent Comm. 351, 352.) Powers in trust are mentioned distinctively only in sections 157, 158, 160–163 and 182 of the Real Property Law, and of these sections 160, 161 and 162 apply only to imperative trust powers. (See *Waterman* v. *N. Y. Life Ins. & Trust Co.*, 237 N. Y. 293; *Holland* v. *Alcock*, 108 id. 312.) Counsel for Mrs. Hubbard argue that other parts of the statute indicate a general plan and purpose to treat powers as property interests, and to apply at least a part of the law of trusts of property to powers in trust. A power in trust, the contention runs, is a trust *res* and the grantee of the power a trustee, who can have no more right to destroy the power than a trustee of any other property to destroy that which is intrusted to him. But this argument is clearly fallacious, because the essence of a property trust is the delivery of the income or principal to the *cestui que trust* irrespective of the will of the trustee, whereas the essence of a discretionary power of appointment, even though in some instances denominated " in trust," is the permission to the grantee to exercise it or not, as he sees fit. In section 138 itself, on the other hand, there is a definite indication that the words " in trust " have some narrower meaning, as applied to a limited power of appointment, than as applied to any other category of trust powers. A general power is said to be in trust where a class other than the grantee is designated " as entitled to " the proceeds or other benefits (Real Prop. Law, § 137), and likewise the designation of persons " as entitled to " a benefit is the characteristic of the kind of special power embraced in sub-division 2 of section 138. The word " entitled," however, does not appear in subdivision 1 of section 138, and the trust quality of the special power there described is due solely to the limitation of its authorized effect to others than the grantee. If any property rights were conferred upon possible appointees under a discretionary limited power of appointment merely by describing the power as " in trust," it would have been unnecessary to set up these two separate categories in section 138.

The predominant intention of the revisers, it appears from their notes, was to differentiate between powers according to whether they are exercisable for the grantee's benefit, or only for the benefit of others (Fowler, *supra*, p. 1300), and they undoubtedly intro-duced into the statute the terms " beneficial " and " in trust " with the primary purpose of expressing this distinction. For example, a general power of appointment of the fee by will may or may not be in trust (Real Prop. Law, §§ 136, 137), while a similar special power is so always, provided the designated class of appointees consists of others than the grantee of the power (Real

Prop. Law, § 138). The revisers' notes, however, while explaining the general features of the new system, failed to comment on the detailed changes, and further light upon the meaning of the statute must be sought in the common law and in general principles of jurisprudence. (*Waterman* v. *N. Y. Life Ins. & Trust Co.*, *supra*; *Cutting* v. *Cutting*, *supra*; *Farmers' Loan & Trust Co.* v. *Mortimer*, 219 N. Y. 290.)

It is conceded that at common law even an imperative power of appointment could be released or extinguished by the act of the donee, provided it was a so-called " power in gross," *i. e.*, if the donee himself had an estate in the land. The premature extinguishment of such powers by tortious feoffment was in fact one of the chief injustices which the new statutes sought to remedy (Fowler, *supra*, p. 1302). Although the revisers said broadly in this connection that " a power to devise only to particular persons is a plain trust," it is clear from their reference to " the rights of the persons entitled to the trust " that they were thinking of imperative powers. And if the power was not imperative, or coupled with the duty, it could be released at common law not only by feoffment but by deed, or by express release. (Farwell Powers [3d ed.], p. 16; *Smith* v. *Plummer*, 17 L. J. Ch. 145; *In re Radcliffe*, L. R. [1892] 1 Ch. 227; *In re Mills*, L. R. [1930] Id. 654, 665.) At common law, however, a power " simply collateral " (*i. e.*, where the grantee had no estate or interest in the land) could not be so released. (Farwell, *supra*, p. 11.) The reasons for this distinction are somewhat obscure, but may be related to a conception that powers simply collateral comprised an element of obligation arising from the intention of the donor. (Co. Lit. 265-b; *Anon.*, 15 Hen. 7, fol. 11-b, as translated in appendix to Sugden, *supra*, vol. 2, p. 455.) Whether the power taken by Mrs. McCormick under the trust deed of 1917 should be considered under the common-law classification a power in gross or a power simply collateral is somewhat speculative, depending upon whether the rights of a beneficiary to receive rents, profits and income is an estate or interest in the trusteed property under our statutory system, under which the entire title was intended by the revisers to be considered vested in the trustee. (1 R. S. 729, § 60; Real Prop. Law, § 100; Fowler, *supra*, p. 487.) A recognized authority has stated that the only importance of the common-law classification of powers was with reference to the ability of the donee to suspend, extinguish or merge them (Sugden, *supra*, vol. 1, p. 110); and accordingly the common-law doctrines of the extinguishment of powers in gross and of the immunity from extinguishment of powers simply collateral, apart from the principles and considerations underlying them, may well be considered abolished with

the classification itself. (Real Prop. Law, § 130; *Matter of N. Y. Life Ins. & T. Co.*, 139 N. Y. Supp. 695, 705.)

Relying on general doctrines of the law of powers, counsel for Mrs. Hubbard contend — and this is the real essence of her claim that the release of 1918 was ineffective — that the phrase " power in trust " implies a fiduciary obligation to the possible appointees of a discretionary special power to keep the power in existence; while the plaintiff's counsel argue that the only trust obligation is one to abstain from seeking personal advantage in dealing with the power, and that any obligation to keep it alive is owed only to the creator of the trust. There was indeed at common law an obligation owed to the grantor of a power not to relinquish it before lapse of the full period allowed for its exercise; a duty that was recognized in the doctrine, now incorporated in the statute, that a power to devise cannot be exercised by deed. (Real Prop. Law, § 167; *Farmers' Loan & Trust Co.* v. *Mortimer*, 219 N. Y. 290; *Learned* v. *Tallmadge*, 26 Barb. 443.) The conception of a duty to the grantor underlies the authorities cited in this connection for Mrs. Hubbard. (*Thomson's Executors* v. *Norris*, 20 N. J. Eq. 489; *Lyon* v. *Alexander*, 304 Penn. St. 288, 292; 156 A. 84.) No case has been cited, however, in which such a duty has been considered as extending independently to the possible appointees; on the contrary, it has been declared terminable and the power extinguishable by joint act of the grantor and grantee of the power, without reference to the appointees. (*Capron* v. *Luchars*, 110 N. J. Eq. 339; 160 A. 83; affd., on opinion below, 112 N. J. Eq. 373; 164 A. 447.) Purely discretionary powers have also been held subject to the principle that the donee of the power, if he elects to exercise it, must not do so for any improper purpose or to secure an unfair advantage to himself. (*Tempest* v. *Camoys*, L. R. 21 Ch. Div. 571; *Thomson's Executors* v. *Norris, supra.*) This principle is particularly appropriate where the donee is by the terms of the instrument excluded from the class of permissible beneficiaries, and accords with the characterization of such a power of appointment as a " power in trust." If there is no inequitable dealing by the grantee for his own advantage, however, there appears no inherent reason why a non-imperative special power of appointment, exercisable only in favor of a limited class, should be any more indestructible than a similar general and beneficial power, where the choice is unlimited. Moreover, it has been said that the principle under consideration does not apply to a release of the power. " It appears to me that there is a fallacy in applying to a release of a power of this kind the doctrines applicable to the fraudulent exercise of such a power. There is no duty imposed on the donee of a limited power

to make an appointment; there is no fiduciary relationship between him and the objects of the power beyond this, that if he does exercise the power of appointment, he must exercise it honestly for the benefit of an object or the objects of the power, and not corruptly for his own personal benefit; but I cannot see any ground for applying that doctrine to the case of a release of a power; the donee of the power may, or he may not, be acting in his own interest, but he is at liberty, in my opinion, to say that he will never make any appointment under the power, and to execute a release of it." (*In re Somes*, L. R. [1896] 1 Ch. 250, 255; see, also, *In re Mills*, L. R. [1930] Id. 654.) And even where a donee is ordinarily prevented by law from executing a power for pecuniary benefit to himself, he may surrender it with the knowledge and consent of the donor. (*Capron* v. *Luchars, supra.*)

No reported case has been found of the termination under section 23 of the Personal Property Law of a trust involving a special power of appointment, but where there have been outstanding general powers of appointment the consents of the grantor, trustee and beneficiaries of the present and future interests have been declared sufficient, in language applicable, at least textually, to such special powers. In *Cruger* v. *Union Trust Co.* (173 App. Div. 797) the Appellate Division, First Department, said of the life beneficiary (who was also the grantor): "The right to dispose of the corpus of the trust by his will did not make anyone else beneficially interested in the trust;" and the same court said in *Sperry* v. *Farmers' Loan & Trust Co.* (154 App. Div. 447), under similar circumstances: "No one is entitled to be appointed to receive the corpus, and no one ever can receive it under the terms of the trust deed unless the plaintiff of her own free will elects to appoint them to be the recipients. She certainly can renounce the power to do that which she is under no compulsion ever to do." To the same effect are *Goodwin* v. *Broadway Trust Co.* (87 Misc. 130); *Mayer* v. *Chase National Bank* (143 id. 714; affd., 236 App. Div. 778), and *Stella* v. *New York Trust Co.* (224 id. 50).

Finally it is argued by Mrs. Hubbard's counsel that the statutory provisions were intended to be a complete code on the subject of powers and that they contain nothing permitting the termination or extinguishment of a power except in section 148, by which a power is declared to be irrevocable unless the instrument creating it contains express authority to revoke. The same argument, however, might be turned in the opposite direction, to the effect that the statute contains nothing which prevents the extinguishment of a purely discretionary power by joint action of the grantor and the grantee, section 148 applying only to a true revocation, *i. e.*,

a calling back of the power by the grantor's act alone. The latter reasoning is the more convincing, especially when applied to such a document as that executed by Mrs. McCormick and Mr. Rockefeller in 1918, which does not purport to be a revocation by the latter, but a surrender and release by the former. It would be an unnatural construction of section 148 to say that it is intended to insert in the law a prohibition against extinguishment of a purely discretionary power by joint act of the grantor and grantee, where no such prohibition existed at common law. There is no suggestion made of any principle of modern public policy which would forbid the termination of such a power. Even powers simply collateral have now been made subject to release by the English Conveyancing Act of 1881 (44 & 45 Vict. ch. 41, § 52; Halsbury, Laws of England, vol. 23, p. 64.) As the possible appointees concededly have no right of enforcement, the creation and continuance of the power are the legitimate concern of no one but the grantor and grantee, and freedom to extinguish it appears to be within the field of natural liberty enjoyed by citizens of a free community unless restrained by positive rules of law.

My conclusion is that a purely discretionary power of appointment is extinguishable by the joint act of the grantor and grantee without consent of the class of permissible appointees, and that the power given Mrs. McCormick by Mr. Rockefeller in the trust deed of 1917 was so extinguished by the instrument of 1918.

Even if Mrs. McCormick had still been entitled in 1932 to exercise the power of appointment, in my opinion her will fails to have any such effect. Its sufficiency for that purpose is to be determined according to the law of New York, the domicile of the grantor of the power and the location of the property. (*Matter of New York Life Ins. & Trust Co.*, 209 N. Y. 585; *Matter of Campbell*, 138 Misc. 800; *Matter of Marsland*, 142 id. 230.) Section 18 of the Personal Property Law reads as follows: " Personal property embraced in a power to bequeath, passes by a will or testament purporting to pass all the personal property of the testator; unless the intent, that the will or testament shall not operate as an execution of the power, appears therein either expressly or by necessary implication." As an intention not to execute the power of appointment does not appear in Mrs. McCormick's will expressly, the question is whether it appears therein by necessary implication. The following are the relevant portions of the will: " *Second.* I give, devise and bequeath unto my daughter, Muriel McCormick Hubbard, one-third (1/3) of all my estate of every kind and nature, real, personal and mixed. *Third.* I give, devise and bequeath unto my daughter, Mathilde McCormick Oser, one-sixth (1/6) of all

my estate of every kind and nature, real, personal and mixed. *Fourth.* I give, devise and bequeath unto my son, Fowler McCormick, one-twelfth (1/12) of all my estate of every kind and nature, real, personal and mixed. *Fifth.* I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed, of every kind and nature, unto my friend, Edwin D. Krenn. * * * *Sixth.* Should any or either of the legatees mentioned in this will die before my death, it is my will that the amount of the legacy herein provided for such person so dying, shall be redistributed among my legatees in proportion to the amounts herein given to them severally. In case any legatee herein named or any heir-at-law or other beneficiary under this will shall begin any proceedings to contest the same, the legacy or the interest of such person shall thereupon be forfeited and his or her legacy shall become void. The amount herein given, bequeathed and devised to such person so beginning any such proceeding shall fall into the residuum of my estate and become the property of my residuary legatee, Edwin D. Krenn."

Two rules have been laid down authoritatively for the application of the statute. In *Lockwood* v. *Mildeberger* (159 N. Y. 181, at p. 186) it is said: " In examining the will in the light of the grandmother's will [the source of the power], and the circumstances surrounding Mrs. Mildeberger [the testatrix] at the time of the execution of her will, it will not suffice to indulge in assumptions, for the law requires that the intent not to execute the power must appear either expressly or by necessary implication. Necessary implication results only where the will permits of no other interpretation. Necessary is defined to mean: ' Such as must be; ' ' Impossible to be otherwise; ' ' Not to be avoided; ' ' Inevitable.' The intent not to execute the power, therefore, must not be implied unless it so clearly appears that it is not to be avoided." On the other hand, it is said more recently in *Guaranty Trust Co.* v. *Halsted* (245 N. Y. 447, at p. 461): " However, if the testator made dispositions of his property which by their very nature are inapplicable to the subject of the power, the intent of the testator not to execute the power would ' by necessary implication ' appear and the power would fail of exercise." In *Lockwood* v. *Mildeberger* (*supra*), where the power was limited by its terms to an appointment in favor of the testatrix's husband and there was a general residuary clause in favor of the testatrix's children, should there be any, and in default of children then in favor of her husband, it was held that no intent not to exercise the power in favor of the husband was to be implied from the facts that the children, had there been any, would have been incapable of taking under the

power and the bequest to the husband was only substitutional. In *McLean* v. *McLean* (174 App. Div. 152) an intent not to exercise a power of appointment by a residuary clause was not implied from the fact that the testator, earlier in the will, had expressly exercised the power by appointing a life interest, accompanied by an invalid appointment of the remainder. In *Speir* v. *Benvenuti* (197 App. Div. 209) a testator who enjoyed a power of appointment over the remainder interest in real property, limited upon a life interest in his daughter, was held to have executed this power by a general residuary devise of all his property in trust for the same daughter during her life, the remainder upon her death to others, and the court rejected the argument that the absurdity of creating a life trust in an estate already limited to take effect only after the death of the beneficiary necessarily implied an intent not to execute the power. And in *Matter of Burling* (148 Misc. 835) the fact that a will, if construed as exercising a power of appointment, would result in an illegal suspension of the power of alienation in respect to some of the property subject to the power, did not prevent the court from holding that the power was in fact exercised, though not mentioned.

In other cases an intent not to exercise the power has been found necessarily implied. In *Guaranty Trust Co.* v. *Halsted* (*supra*) the testator in his lifetime had created a trust fund in respect to which he had reserved a power of appointment over certain surplus income. By his will his residuary estate, which was defined as including " all rights, powers and interests in, over and concerning property of every kind and wheresoever situated," was directed to be divided into four equal parts, in two of which ordinary life interests were created with remainders over, and the other two were directed to be held in trust for certain life beneficiaries, with discretionary power in the trustees to withhold all or any part of the income from the beneficiaries during their respective minorities. It was held that these dispositions were " by their very nature inapplicable to the subject of the power " and consequently gave rise to a necessary implication of the intent of the testator not to execute the power by the will. Two of the considerations leading to this conclusion were, *first*, that the trustee under the will would be in no position to exercise discretion concerning the surplus income, which would have to be administered by the trustee under the deed of trust; and *second*, that if the surplus income were to be treated as part of the capital of the respective shares into which the residuary estate was divided, its capitalized value would be a wasting asset requiring amortization, which could not be accomplished by either the trustee under the

will or the trustee under the deed. And in *Stewart* v. *Keating* (15 Misc. 44), where the life beneficiary of a trust enjoyed a power of appointment over the remainder, the exercise of which was limited to the lineal descendants of her father who was the creator of the power, and by a general residuary clause of her will created trusts for nephews and nieces and in default of issue to collateral relatives who were not her father's descendants, it was held that an intent not to execute the power must be necessarily implied for a number of reasons, one of which was that the contingent remaindermen named in the residuary clause were beyond the scope of the power of appointment. It is said in the opinion (at p. 53): " It is not possible that Julia Rhinelander could have believed that she was exercising the power of appointment under her father's will when she created a trust during the lives of his lineal descendants and made it possible for the absolute ownership of the property which was the subject of the power to vest in his collaterals. To ascribe such an intention to the testatrix would impute to her a deliberate purpose of violating the express wishes of her father, and a total disregard of the limitations imposed upon the created power — a purpose which she is not to be deemed for a moment to have entertained."

The facts in the present case, in my opinion, resemble more closely those in *Guaranty Trust Co.* v. *Halsted* (*supra*) and *Stewart* v. *Keating* (*supra*) than those in any of the cases in which an intent not to exercise the power was held not to be necessarily implied. It is difficult to imagine testamentary provisions, other than express declarations and attempted appointments which would be wholly illegal, or for some other reason completely ineffective, more indicative of an intent not to exercise the power of appointment than those of Mrs. McCormick's will. She not only gave five-twelfths of her entire estate to a person who was not within the class of appointees permitted under the terms of the trust deed, but she also provided that the said individual should take, *first,* an additional share out of the part allotted to any of her children who might predecease her, and *second,* the entire share of any of her children contesting the will. These provisions obviously cannot carry any share in the trust fund to Krenn, but no plan is established for redistribution of the trust fund in the event of a death or contest different from that provided for the testatrix's own property, although it is clear that the portions of the legatees in the fund and in the individual property respectively would become progressively unequal with successive deaths. If the defendant Mrs. Hubbard's contentions are correct, a distinction would be created between the treatment to be accorded the share

of the individual estate bequeathed to one of Mrs. McCormick's children, who might contest the will, and the share of the trust fund passing to the same person under the exercise of the power, in that the former would go by substitution to Krenn, while the latter would fail of appointment and consequently follow the course provided for that contingency in the trust fund, in spite of the fact that the relative proportions intended by Mrs. McCormick to prevail among her children, as expressed in her will, would be completely upset, and the further fact that the penalty intended by Mrs. McCormick to be inflicted upon a contesting child would be at least partially averted. An intention to make no testamentary disposition at all is to be implied in preference to one which results in an unequal distribution in conflict with the main scheme of the will. (*Brown* v. *Quintard*, 177 N. Y. 75.) Moreover, Mrs. Hubbard's theory of construction would result, in case of the death of one of Mrs. McCormick's children during her lifetime, in divesting the children of that child of the interests given them under the trust deed in favor of the survivors, a very unnatural disposition in the absence of explanatory circumstances. The dispositions made of her own property by Mrs. McCormick are consequently, in my opinion, " by their very nature inapplicable to the subject of the power," and her intention not to execute the power, therefore, appears by necessary implication. " Clearly, the will of the testator, as an instrument of designation supplementing the trust indenture, since it is incompatible therewith, is unsuited to the task." (*Guaranty Trust Co.* v. *Halsted, supra,* at p. 467.)

I find no logical force or persuasiveness in the argument of Mrs. Hubbard's counsel that any intent not to execute the power of appointment must be implied, not from the very provisions by which the testatrix's own property is disposed of, but only from other language in the will. This argument conflicts with the reasoning adopted in *Guaranty Trust Co.* v. *Halsted (supra),* even though the conclusion in that case was additionally bolstered by reference to another clause. Nor am I impressed with the argument that before the testatrix can be held to have an intention not to exercise the power, it must not only be shown that she knew of the original creation of the power, but also that she knew she had the right to exercise it at the time of making her will. One can certainly have an intent not to do a thing irrespective of ability to do it, and it makes no difference whether Mrs. McCormick intended not to execute the power because doubtful of her right to do so, or because she reached her decision on some other ground.

It is beyond dispute that Mrs. McCormick knew of her power under the trust deed, because she had not only joined in the instru-

ment of 1918 in an attempt to destroy it, but she had executed a prior will in 1931 in which she expressly referred to it. This knowledge is an important circumstance to be considered in construing the will. (*Lockwood* v. *Mildeberger*, 5 App. Div. 459, 462; revd., 159 N. Y. 181, 187.) Another circumstance to be taken into consideration is the fact that when the will was made the value of the trust fund was in the neighborhood of $8,000,000, while the testatrix's individual property was estimated at about $1,000,000. Mrs. Hubbard contends, it is true, that it is improper to consider any evidence in this connection other than the words of the will, citing *Lockwood* v. *Mildeberger* (*supra*) and *Speir* v. *Benvenuti* (197 App. Div. 209), but I do not read either of these cases as establishing any such doctrine, or as differentiating between the execution of powers of appointment and other testamentary dispositions with respect to the duty of the court to consider the circumstances surrounding the testator, including the property subject to the operation of the will, as an aid to its construction. (*Matter of Smith*, 254 N. Y. 283; *Fell* v. *McCready*, 236 App. Div. 390.)

Mrs. Hubbard further lays much stress upon the definitions of the word " necessary " quoted from *Lockwood* v. *Mildeberger* (*supra*). Clearly these definitions are not to be pushed to the extent of requiring that the power be considered exercised if effect can be given to the appointment in any degree by any possible construction of the will. The argument would render the exception in the statute superfluous, for it amounts to a contention that an intent not to exercise the power shall be implied only where its exercise would be invalid. It also conflicts with *Guaranty Trust Co.* v. *Halsted* (*supra*).

In view of the conclusion reached, it is unnecessary to give any effect to the evidence received concerning the law of Illinois and the other circumstances testified to by Judge Cutting.

For the reasons stated, the children of Mrs. McCormick take no part of the principal of the trust fund through the will of their mother.

The second main controversy in the case arises from the contention of the defendant Chicago Title and Trust Company as executor of Mrs. McCormick, and of the intervening defendants Rissman and Baldwin, who are assignees of Edwin D. Krenn, that Mrs. McCormick was entitled in her lifetime to the major portion of the stock dividend received by the trustee in 1929. As created by the grantor the trust fund consisted of 12,000 shares of the capital stock of Standard Oil Company of Indiana. In 1920 the par value of this stock was reduced from $100 to $25 per share,

and the trustee received 48,000 of the new shares in place of the 12,000 old ones. Later in the same year the company declared a 150 per cent stock dividend, by which the trustee received 72,000 additional shares, and in 1922 a second stock dividend of 100 per cent, by which the number of shares held in the trust was increased to 240,000. Of these 2,937 were subsequently sold, but 51 additional shares were purchased, making the number in the trust fund 237,114 on February 4, 1929, on which date a further stock dividend of fifty per cent was declared, bringing the total number of shares in the hands of the trustee at the present time, as shown by the account, to 355,671. No part of any of these stock dividends was ever paid over to Mrs. McCormick as income of the trust, and the executor and the Krenn assignees now claim that her estate is entitled to most of the 118,557 shares received in 1929 under the rule laid down in *Matter of Osborne* (209 N. Y. 450), which is in substance that in the absence of other intention disclosed in the trust instrument extraordinary stock dividends belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the maker of the trust or invested in the stock, in which case there should be apportioned to the principal of the trust only so much as is necessary to preserve the integrity of the capital. No claim is made to any part of the earlier stock dividends because of events related hereafter.

The plaintiff and others of the parties in interest, without admitting that any part of the 1929 stock dividend was income under the rule of the *Osborne* case, contend that it has all been properly allocated to the principal of the trust by reason of the provisions of the trust deed and action taken thereunder, and they also dispute the calculations under which an apportionment is sought. In the trust instrument the grantor, immediately after providing for the conveyance of the trust fund to the trustee, appointed a committee of five persons, closely associated with the grantor by family and business connections, and invested them with certain broad powers of control over the trust fund and over the action of the trustee, subjecting the actions of the latter in many respects to the consent of the committee. One of the paragraphs contains the following: " The trustee, with the consent of the committee, shall have power to determine all questions, whether any moneys, securities, properties, stock dividends, rights or other things, are to be treated as capital or income." A procedure is established for filling vacancies in the committee, and it is further provided that " all actions by my committee shall be by resolution in writing signed by a majority of the members who shall at the time be acting, but such resolutions may be in one or more dupli-

cate originals." After the declaration and payment to the trustee of the fifty per cent stock dividend in 1929, four of the five members of the committee signed a written resolution consenting to the determination by the trustee that all of the 118,557 shares of stock (together with 1,443 not involved in this accounting) received as such stock dividend be allocated to the principal of the trust, and they have been so allocated in the account now before the court. The fifth member of the committee refused to sign the resolution. The executor and the Krenn assignees concede that this apportionment entirely to principal, even though the dividend represents earnings of the corporation subsequent to the creation of the trust, would not effect an unlawful accumulation of income in violation of the statute (*Equitable Trust Co.* v. *Prentice*, 250 N. Y. 1); but they contend that the power given in the trust instrument to the trustee with the consent of the committee to determine whether stock dividends are to be treated as capital or income was not intended to embrace an arbitrary discretion, but is limited to a determination of the facts, figures, values and calculations which would be necessary to ascertain the source of the dividends, the capital value of the trust and the apportionment of the dividend between principal and income according to the rule laid down in the *Osborne* case. The trustee and the other interested parties contend, on the other hand, that the power given in the trust instrument to the trustee and to the committee includes the right to allocate a stock dividend to capital or income irrespective of its source and in their absolute discretion, and that their action in allocating the entire 1929 dividend to capital is not subject to review, except perhaps on proof of improper motive.

The plaintiff asserts that this question of the construction of the trust instrument had been determined in its favor in *Equitable Trust Co.* v. *Prentice* (*supra*), which is relied upon as a conclusive authority. In view of the vigorous arguments now made it is necessary to examine the record in that case with some particularity. It was an action for settlement of the accounts of the trustee under a trust deed precisely similar, so far as the present point is concerned, to the trust deed here in question, having been made at the same time by the same grantor to the same trustee, and creating a trust fund in shares of stock of the same company upon similar terms for the life benefit of another daughter of the grantor. In its account filed with the complaint, the trustee had apportioned a part of the 1920 and 1922 stock dividends to income, but later filed a supplemental complaint, stating that the committee had disapproved this apportionment and asking leave to amend the account, if it might lawfully do so, by allocating the entire

dividends to principal in accordance with the wishes of the committee. This was opposed by the life beneficiary. A referee was appointed to hear and determine the issues and an order was entered directing him, prior to the trial of any other issues, to try and report on two specific issues, described as " issues of law and fact." The first of these was substantially the same as that raised in the present action as to the interpretation of the trust deed, namely, whether the grantor had intended to give the trustee and the committee the power to allocate the entire stock dividends to principal, and the second question was whether such allocation would be valid, notwithstanding that in the absence of such provisions in the trust deed some of the shares would be allocable to income under the law of New York. It was further provided in the order that if the decision upon *either or both* of these issues should be in the *negative*, judgment should be entered that the correctness of the account as filed be examined by the referee; but that if the decision upon *both* of these issues should be in the affirmative the trustee should be allowed to file an amended account allocating all of the stock dividends to principal. The referee decided the first question in the affirmative and the second in the negative, finding as a matter of fact that it was the intention of the grantor, as expressed in the trust agreement, to grant the trustee and the committee the full powers claimed, but as a conclusion of law he found in substance that the trust deed in this respect was invalid as permitting unlawful accumulation of income in violation of section 16 of the Personal Property Law. Judgment was entered on this report pursuant to the order for the trial of the separate issues, directing that the referee examine the accounts of the trustees as filed. On appeal by the trustee and the remaindermen to the Appellate Division, First Department, the second question submitted to the referee was answered in the affirmative, the judgment was reversed, and the trustee was ordered to file an amended account allocating the entire stock dividend to principal (223 App. Div. 615). Leave was granted to the life beneficiary to appeal to the Court of Appeals on a certified question, which was in substance whether the allocation of the entire stock dividends to principal, pursuant to the provisions of the trust agreement found to express the intent to give such power, was lawful. The life beneficiary did not request the certification of any separate question respecting the interpretation of the trust indenture. The judgment of the Appellate Division was affirmed and the certified question answered in the affirmative (250 N. Y. 1).

Mrs. McCormick was not a party to that action, but the plaintiff now insists that her estate is foreclosed from questioning the decision

there reached. The Krenn assignees and the executor, however, contend that the question of the construction of the trust instrument was neither actually considered by the appellate courts nor even within their jurisdiction, *first,* because the life beneficiary did not appeal to the Appellate Division from the unfavorable determination of the referee, and *second,* because the jurisdiction of the Court of Appeals was limited to the certified question. A thorough examination of the record as well as of the technical arguments diligently pressed on both sides leads me to the conclusion that affirmance of the referee's decision was necessarily involved in the action of the Appellate Division, but not in the response of the Court of Appeals to the question certified. However, it appears beyond dispute from the briefs on appeal that all parties failed to argue the construction of the trust deed in either court, and accordingly even the decision of the Appellate Division has little force as an obligatory precedent. ( *United States* v. *Mitchell,* 271 U. S. 9, 14; *Cross* v. *Burke,* 146 id. 82, 87; *Tefft, Weller & Co.* v. *Munsuri,* 222 id. 114, 119; *Matter of Lyman,* 161 N. Y. 119; *Molony* v. *Dows,* 8 Abb. Pr. 316, 331.)

But irrespective of the appeals in the *Prentice* case, I should nevertheless construe the trust deed here in the same way that the distinguished referee in that case construed the Prentice trust deed. The committee selected by the grantor in the trust deed consisted of his son, John D. Rockefeller, Jr.; two sons-in-law, E. Parmelee Prentice and Harold F. McCormick, the latter being then the husband of the life beneficiary; Starr J. Murphy, who was the grantor's personal counsel, and Willard S. Richardson, a personal and family friend long associated with the grantor and his son in connection with the management of their philanthropic activities and the care of securities. At the time of the allocation of the 1929 stock dividend to principal, Harold F. McCormick had resigned and been succeeded by his brother, Cyrus H. McCormick, and Murphy had died and been succeeded by Bertram Cutler, an investment adviser employed in the grantor's office for more than thirty years. The functions given to the committee are important and serious, and far-reaching powers, by no means limited to mere administrative details, are extended for their fulfillment. The measure of benefits enjoyable by the beneficiaries is intrusted in more than one instance to the judgment and discretion of the committee. In the event of the future trusts for the benefit of the issue of Mrs. McCormick arising through her failure to exercise her power of appointment, the beneficiaries are to receive only so much of the net income as the committee shall from time to time in its absolute and unrestricted discretion deem

wise, the balance to be divided among charitable corporations to be selected by the committee. The committee is further authorized in such event to make payments from the principal of each beneficiary's share at or after the age of thirty years, with power on the other hand to continue the trusteeship over the entire share for life; and in the event of the death of either Mrs. McCormick or of any future beneficiary without issue, the committee is empowered to distribute the principal theretofore held to or among such charitable corporations for such of their purposes as the committee may see fit. The significance of these powers is increased by a special admonition to the committee to have no hesitation in withholding even large sums from the beneficiaries, because the grantor believed more harm might come from receiving too much than too little. The consent of the committee, furthermore, is a prerequisite to the exercise by the trustee of powers to sell, reinvest and manage the trust property, and serves to extend such powers to non-legal investments and even to the making of loans on the security of any personal property whatsoever. The committee may also permit the trustee to consent to the reorganization or consolidation of corporations the securities of which are held in the trust fund, and to exercise subscription rights and other options belonging to security holders; and the trustee may, with the consent of the committee, make advances out of either principal or income for payment of taxes or for the protection of any investments, determine the distribution between capital and income of any payments made in the exercise of subscription rights or as expenses of the administration of the trust, and determine whether and to what extent amortization is required in the case of securities purchased at a premium. No limitation is imposed upon the judgment and determination of the committee with respect to the exercise of these various powers, and considering their broad scope, especially in light of the close confidential relationship of the committee members to the creator of the trust, the trust instrument discloses in my opinion an intention that in the allocation of stock dividends the committee's function is not to be limited to mere examination and review of the accuracy of the trustee's computations, but extends to the recognition of factors other than the technical source of the dividend and the corporate surplus capitalized thereby. Neither the arrangement of sentences and paragraphs, nor the occasional and unsystematic use in some instances of the phrase " absolute and unrestricted discretion," serves to color the word " determine " with any narrow or technical meaning in this connection.

The fact, if it be a fact, that when the trust deed was executed the New York law was generally believed, as contended by the Krenn assignees and the executor, to prevent the allocation to principal of any part of a stock dividend representing profits of the corporation earned since the creation of the trust, would not warrant the presumption of an intention to limit the powers of the committee irrespective of what the law might be or might afterward become. It has since been conclusively established that the rule of apportionment of stock dividends laid down in the *Osborne* case, which had been decided prior to the creation of this trust, is merely a rule of presumed intention, to be applied in the absence of any contrary intention expressed in the trust deed. (*Equitable Trust Co.* v. *Prentice, supra.*)

But it is further argued by the executor and the Krenn assignees that no actual allocation of this 1929 stock dividend to the principal of the trust was ever made by the trustee with the consent of the committee. The particulars of the determination of the allocation appear only vaguely in the testimony. The officers of the trustee considered a number of factors, but there is no doubt that its decision was influenced largely by the attitude of the committee upon the allocation of the prior stock dividends in this trust and in the similar Prentice trust. There is nothing, however, to show that it was surrendering its own judgment or that it was not acting in good faith. The objection that the trustee notified the committee of its intention to allocate the entire dividend to principal and received the committee's approval before making its own decision final, is technical and without weight. Equally unsubstantial is the somewhat inconsistent objection that the committee had no right to views of their own but were limited to granting or withholding consent that the trustee make an unreviewable determination. This would amount to transferring the discretion of the committee to the trustee, and would be a strained and artificial construction of the language of the instrument in opposition to its whole tenor. The committee's determination, it is true, was not reached in a formal meeting; the resolution of approval was prepared by the trustee, and one copy was signed by three of the members and another copy by the other consenting committeeman. This procedure was in accordance with the practice of the committee and was expressly authorized by the clause in the trust deed which has been already quoted. The obvious intention that formal meetings should be unnecessary is not contradicted by the authority given to each committeeman by proper power of attorney to delegate his full powers as committeeman to a substitute in case of sickness, absence from New York, or other reasons. Such

authorization would be appropriate where inability of a committeeman to perform his duties was anticipated.

Accordingly I hold that the entire stock dividend of 1929 was duly allocated to the principal of the trust by the trustee with the consent of the committee, pursuant to powers granted in the deed of trust, even though in the absence of such powers Mrs. McCormick would have been legally entitled to a portion of such dividend as income.

The practical importance of the foregoing ruling in this case depends upon whether, except for the powers granted to the committee and the trustee, any part of the 1929 stock dividend must have been allocated to income. All parties agree that in the absence of such powers, or other evidence of the grantor's intention, the proper allocation or apportionment between principal and income must be determined by the principle and formula announced in *Matter of Osborne* (*supra*) as follows: " The proposition decided by us in this case is, that in all cases of extraordinary dividends, either of money or stock, sufficient of the dividend must be retained in the corpus of the trust to maintain that corpus unimpaired and the remainder thereof must be awarded to the life beneficiary. The method of accomplishing this result is not difficult. The intrinsic value of the trust investment is to be ascertained by dividing the capital and the surplus of the corporation existing at the time of the creation of the trust by the number of shares of the corporation then outstanding, which gives the value of each share, and that amount must be multiplied by the number of shares held in the trust " (209 N. Y. 450, at p. 484). Gain from increment of capital valuation, as distinguished from earnings, is to be added to principal. (*Matter of Hagen*, 262 N. Y. 301, 305; *Pratt* v. *Ladd*, 253 id. 213, 219; *Matter of Hamersley*, 152 Misc. 903, 910.) The basic facts and figures are undisputed, having been obtained chiefly from the books of the Standard Oil Company of Indiana. A wide divergence has nevertheless developed between the calculations by the respective parties of the capital value of the trust which must be kept unimpaired before any part of the dividend is allocable to income, a divergence which results from conflicting views as to the principles or theories to be adopted in giving their proper effect to certain important factors. At least one suggested combination of theories places the capital value of the trust at the time of the declaration of the stock dividend so high that the entire dividend must be allocated to capital to keep the latter unimpaired, leaving nothing for income.

It is agreed that the proper starting point is the book value of the original shares of the Standard Oil Company of Indiana

at the time of the creation of the trust on July 3, 1917. The company never made any balance sheet as of that date, however, and the first question presented is whether a proportionate part of the net earnings for the entire year 1917 is to be added to the capital and surplus as of December 31, 1916, or whether a proportionate part of the net earnings of the last six months of 1917 is to be added to the capital and surplus as of June 30, 1917. As the accountants employed on both sides united in using the entire year as a basis for prorating other adjustments of the figures which they agreed were necessary because of retroactive corrections which the company itself had made in later years, and as in determining the net earnings for any period an important item of deduction from gross profits is the corporate income and excess profit taxes which are calculated upon the earnings of the entire year, I find that the more accurate calculation of the value of the stock on July 3, 1917, will, under the circumstances here presented, result from using the entire year 1917 as a basis of computation and adding proportionate net earnings to the capital and surplus at the end of the year preceding.

The second question presented, which also concerns the book value of the stock on July 3, 1917, is whether the corporate income and excess profits taxes paid by the company in 1918 are proper deductions from the earnings of 1917. The balance sheets set up at the end of 1916 and 1917 neither showed a reserve for such taxes nor treated them as accrued liabilities, although the books were kept on an accrual basis and although the practice was adopted in subsequent years of setting up such a reserve on the liability side of the balance sheet. The evidence shows that it is the usual accounting practice to treat taxes as current liabilities for the years in which they accrue, and it has now been established as a matter of law that Federal income taxes are obligations of the taxpayer during the period of receipt of the income upon which they are to be subsequently calculated, and even before the enactment of the statute by which they are imposed. (*Updike* v. *United States*, 8 F. [2d] 913; cert. denied, 271 U. S. 661; *Fawcus Machine Co.* v. *United States*, 282 id. 375; *Brady* v. *Anderson*, 240 Fed. 665; cert. denied, 244 U. S. 654.) Accordingly I hold that the income and excess profits taxes paid by the Standard Oil Company of Indiana in 1918 should be deducted in calculating the book value of the stock at the time of the creation of the trust.

The third difference of opinion arises out of capital profits made by the company on a series of exchanges, at various times after the creation of the trust, of shares of its stock for stock of Midwest Refining Company. While some of these exchanges showed

a loss, the result of the entire series was a gain. The Krenn assignees and the executor contend that only the net gains should be counted in calculating the capital of the trust fund at the time of the declaration of the stock dividend, while the trustee contends that all the gains should be added and the losses disregarded. The trustee refers to *Bourne* v. *Bourne* (240 N. Y. 172), but in my opinion that case is inapplicable where a series of similar transactions shows a net gain and there has been an increase rather than a decrease of the capital and surplus since the creation of the trust. Accordingly the calculations of the Krenn assignees and of the executor are sustained on this point.

The final and most serious difference between the parties in respect to the valuation of the capital to be maintained unimpaired arises from their conflicting interpretations of an agreement in writing between Mrs. McCormick, Mr. Rockefeller and the trustee, dated December 6, 1926. The trustee had commenced an action in 1925 for the settlement of its accounts, in which it allocated to Mrs. McCormick as income 123,824 out of the 192,000 shares received as the stock dividends of 1920 and 1922, which allocation, however, had then been neither consented to nor opposed by the committee. By supplemental complaint filed in May, 1926, the trustee alleged that the committee had disapproved the allocation of said shares to income and had requested the trustee to determine that all of the entire stock dividends be allocated to principal of the trust, and had consented to such allocation; and the trustee declared its readiness to amend its account by making such allocation if the court should determine that such action was authorized by the trust agreement and permitted by law. At the same time there was pending in the Federal court in Indiana a suit on behalf of one of the infant remaindermen to have the entire 192,000 shares adjudicated a part of the principal of the trust. The record shows that the trustee, as in the similar procedure in the *Prentice* case, was acting under the advice of counsel and was endeavoring in good faith to obtain a judicial determination of the points in issue. Before such determination was reached, however, a settlement was effected between the principal parties by the above-mentioned agreement of December 6, 1926, under which the entire stock dividends of 1920 and 1922 were retained as part of the principal of the trust by consent of Mrs. McCormick, who, however, reserved her rights with respect to any future stock dividends. The language of this agreement will receive attention hereafter. Thereupon the trustee filed in its accounting action a second supplemental complaint reciting the settlement agreement and amending the account by allocating all of the stock dividends to principal.

A judgment was entered February 3, 1927, approving the account as so amended, but without prejudice to the rights of any party with respect to any future stock dividends.

In now applying the *Osborne* rule to the 1929 dividend, it makes a great deal of difference whether the capital value of the trust which must be preserved intact under that rule is to be considered as augmented by the 123,824 shares of the 1920 and 1922 stock dividends to which Mrs. McCormick had previously laid claim. By the first paragraph of the agreement of December 6, 1926, Mrs. McCormick agreed that the trust company " may allocate to and treat as principal of the trust fund " all of the 192,000 shares received as the stock dividends of 1920 and 1922, and by the second paragraph she assigned, transferred and set over to the trustee all of her right, title and interest, if any, in and to the said shares to be held as a part of the principal of the trust fund. Paragraph V reads as follows: " It is understood and agreed that nothing in this instrument shall be construed to affect in any manner or degree the rights, if any, which Mrs. McCormick may have to receive as income any shares of stock which the Trust Company may hereafter receive on account of stock dividends declared upon any shares of stock now or at any time hereafter held by the Trust Company as part of the principal of said trust fund under the aforesaid deed of trust." The trustee now argues that the transaction resulted in establishing a new " intact value " for the trust capital and that by the language quoted Mrs. McCormick merely reserved her right to contend that the committee and the trustee would not be authorized to apportion any future stock dividends without regard to the *Osborne* rule, whereas the executor and the Krenn assignees insist that she only consented that the 1920 and 1922 dividends might themselves be added to the principal of the trust, without affecting future stock dividends in any way whatever, and that she reserved her rights, in connection with any future stock dividends, to claim that the 123,824 shares had not become a part of the capital which must thereafter be always held intact.

It is probable that at the time of the execution of the settlement agreement and the entry of the judgment neither party considered this question. It appears clearly from the preamble that what they had in mind was the settlement of the pending litigation and the disposition to be made of the stock dividends already declared. As a result of the action then taken the shares theretofore claimed by Mrs. McCormick indisputably became a part of the principal of the trust, free from any claims of hers to their ownership or possession ; but there is nothing to suggest any intention

to imply the consequence that the principal so augmented must thereafter be preserved against diminution by stock dividends declared in the future. No such implication would be necessary, because even if the law was believed to prevent an accumulation of income there was no legal principle that forbade a distribution of a part of the principal of the trust to the life beneficiary if the parties so intended. The recited consideration for Mrs. McCormick's concurrence in the settlement, namely, her affection for her father and his agreement to pay her expenses in the pending litigation, would scarcely constitute the surrendered shares additional investments of the trust which must in that event be kept individually intact. (*Matter of Hamersley*, 152 Misc. 903.) The reservation of future rights is expressed in sweeping language, of which the normal meaning, especially in light of the circumstances under which it was used, clearly in my opinion expresses the intention that Mrs. McCormick, or those claiming through her, should be free to contend, in connection with all future stock dividends, that she had been entitled to receive a portion of the previous stock dividends had she so insisted. She would have been so entitled except for the powers granted in the trust instrument to the trustee and the committee. Accordingly I find that the number of shares of the 1929 dividend which would be required to keep the capital of the trust fund intact, and also the number of shares to which Mrs. McCormick's estate would be entitled under the *Osborne* rule, should be calculated, so far as this point is concerned, in accordance with the contentions of the Krenn assignees and the executor. The precise number of shares may be calculated from the evidence and determined on the settlement of the referee's report, or a supplemental hearing may be arranged if desired. The formula being clear, there is no reason for ordering an apportionment by the trustee and committee (*Hull* v. *Hull*, 24 N. Y. 647, 652), especially when this would conflict with the allocation already made and now found to have been within their power.

The contention of the Krenn assignees that the trustee was at fault in keeping the trust fund invested only in the stock of the Standard Oil Company of Indiana has been practically abandoned, and is overruled.

The attorneys are requested to submit findings.